Iris Halpern*
Azra Taslimi*
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
ih@rmlawyers.com
at@rmlawyers.com
*Attorneys for Plaintiff*
*\* Admitted Pro Hac Vice*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| BARBARA SUZETTE BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:24-cv-228-RP |
| | ) | |
| LLANO COUNTY, a municipality; | ) | |
| RON CUNNINGHAM, | ) | |
| in his official capacity as Presiding Officer | ) | |
| of the Llano County Commissioners Court, | ) | |
| and his individual capacity; | ) | |
| AMBER MILUM, | ) | |
| in her official capacity as Director of | ) | |
| Llano County Library System, | ) | |
| and her individual capacity; | ) | |
| JEREMY DON MOSS, in his individual capacity; | ) | |
| BONNIE WALLACE, in her individual capacity; | ) | |
| ROCHELLE WALLACE, in her individual capacity; | ) | |
| RHONDA SCHNEIDER, in her individual capacity; | ) | |
| And, GAY GASKIN, in her individual capacity; | ) | |
| | | |
| Defendants. | | |

_____

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED
COMPLAINT [ECF 12]**

_____

This case exposes a calculated agenda orchestrated by the Defendants to not only obstruct Plaintiff from fulfilling her duties as head librarian but also to inflict personal and professional harm upon her solely because she resisted their discriminatory and censorious agenda. Defendants not only violated Ms. Baker's statutory and constitutional rights but also those of the broader community. As this Court previously recognized in *Little v. Llano County,* Defendants engaged in the "targeted" removal of books based on the "desire to remove books promoting ideas with which they disagree," including, "well-regarded, prize-winning books" containing critical race theory and LGBTQ+ content. Those motives matter here. When Ms. Baker opposed such personal biases and resisted Defendants' censorship, Defendants retaliated against her and eventually terminated her employment. In doing so, Defendants violated numerous laws, and Ms. Baker's detailed forty-two-page Amended Complaint, with nearly two hundred factual assertions, sufficiently pleads factual allegations to support her legal claims.

## I.  PLAINTIFF'S FACTUAL ALLEGATIONS

Plaintiff filed her Amended Complaint on May 22, 2024. *See* ECF No. 12. Despite articulating 146 paragraphs (approximately 30 pages) of well-pled, non-jurisdictional facts, Defendants generally argue that Plaintiff's pleading fails to state a "proper claim or meet the pleading standard." *Mot. to Dismiss Amend. Compl.*, at 3. However, they do so with a broad brush, failing to identify with specificity where Plaintiff has failed to state legal claims or insufficient facts to at least plausibly support those legal claims at this early juncture of litigation. The Amended Complaint's factual allegations, if taken as true, sufficiently demonstrate Defendants' persistent efforts to remove books from the library because of the racial or LGBTQ+ authors and content of the books and that Defendants' conduct has violated various constitutional rights and federal laws. For example:

- Factual allegations that depict a coordinated effort by Defendants to enforce censorship in Llano County, Texas, targeting materials that contradicted their personal beliefs. ¶¶ 43-45, 47, 49, 51-56, 64-66, 71-80, 82-87, 92, 94, 116-117.

- Factual allegations that show Defendants Baskin, Schneider, Wallace, and Wells initiated a censorship campaign by demanding the removal of specific books from library shelves, citing them as "inappropriate." ¶¶ 37, 55, 84-86.

- Factual allegations that show Defendants orchestrated the closure of  the Llano County Library System to facilitate the removal of books they personally disfavored. ¶¶ 80-85.

- Factual allegations that Defendants Cunningham and Moss voted to suspend access to the library's digital materials because they believed it provided access to the books that the Commissioners personally considered "inappropriate." ¶ 86.

- Factual allegations that Defendants Cunningham and Moss voted to dissolve the existing library board and create a new one consisting solely of members from the community's pro-censorship faction, including Defendants Baskin, Schneider, Wallace, and Wells. ¶¶ 87-89, 91, 152, 157.

- Factual allegations demonstrating how Ms. Baker consistently opposed Defendants' censorship efforts, including by voicing First Amendment and discrimination concerns, refusing to remove books, and suggesting alternatives to censorship. ¶¶ 38, 46, 59-64.

- Factual allegations about her role in creating and promoting on social media a book display featuring banned books. ¶¶ 112-115.

- Factual allegations articulating how Defendants Moss and Cunningham utilized coercive tactics to ensure compliance with their discriminatory censorship agenda where both implicitly and explicitly conveyed to Defendant Millum that her continued employment hinged on adhering to their demands for book removal.. ¶ 39-40.

- Factual allegations showing how Defendants Gay Baskin, Rhonda Schneider, Bonnie Wallace, Rochelle Wells, Ron Cunningham, and Amber Milum used inflammatory labels such as "pornographic filth" and "inappropriate" to foster resentment and distaste for certain constituent communities and to target books centered on the experiences of LGBTQ+ constituents and racial minorities. ¶¶ 37, 43-45, 51, 55, 80, 84-86, 158-161, 164-167.

- Factual allegations explaining how the use of protectionist language used by Defendants is a well-known tactic used by advocates of censorship to alarm the public and secure support for discriminatory censorship and activities. ¶¶ 158-159, 161, 167.

- Factual allegations showing how individual Defendants colluded to violate the rights of Ms. Baker and others in the community as evidenced by communications between them plotting to engage in censorship. ¶¶ 97-104, 107-111.

- Factual allegations describing Ms. Baker's protected activities including attending meetings as a private citizen and how Defendant Baskin falsely accusing Ms. Baker of causing a disturbance and questioning her presence. ¶ 98-100, 103-104.

- Factual allegations describing how Defendant Baskin falsely accusing Ms. Baker of causing a disturbance and questioning her presence. ¶¶ 99, 103.

- Factual allegations describing the disciplinary campaign and initiatives to silence librarians imposed by Defendant Milum citing directives from Cunningham. ¶¶ 107, 109-111.

- Factual allegations describing how Milum ordered Ms. Baker to remove a display of books and delete social media posts as a result of the Bonnie Wallace Spreadsheet. ¶¶ 116-117.

- Factual allegations about a reprimand for "insubordination" issued by Defendant Milum after Defendant Baskin interrogated Ms. Baker about attending meetings and complaining about discrimination and censorship. ¶¶ 100-104.

- Factual allegations demonstrating how Ms. Baker's persistent resistance to censorship significantly frustrated Defendants. ¶¶ 120-124.

- Factual allegations describing how Defendants terminated Ms. Baker for "refusing to follow instructions" to remove books from the shelves. ¶ 119.

Plaintiff also pled a number of background facts which Defendants ignored relevant to policy and decision-making powers and governance structure. For example:

- Factual allegations showing that Defendants Cunningham, Moss, Wallace, Wells, Schneider, and Baskin directly engaged in censorship activities and influenced Plaintiff's termination. ¶¶ 120-124.

- Factual allegations alleging that Defendants Baskin, Schneider, Wallace, Wells, Cunningham, and Milum were actively involved in initiating and enforcing the removal of books. ¶¶ 37, 42-58, 64-65, 73-75, 80-87, 92, 94-96, 139, 142, 144-147, 150, 156.

- Factual allegations showing Milum, as the system head, carrying out directives to remove books and reprimanding Plaintiff at the behest of Moss and Cunningham. ¶¶ 135, 139.

These details and others in the Amended Complaint are all profoundly relevant to Plaintiff's claims but are ignored in Defendants' Motion.

## II.  APPLICABLE LEGAL STANDARDS

### A.  Subject Matter Jurisdiction Under Federal Rule of Civil Procedure 12(b)(1)

Lack of subject matter jurisdiction deprives federal courts from adjudicating matters that fall outside of the scope of their limited jurisdiction. Fed. R. Civ. P. 12(b)(1). However, a federal court

should only dismiss a case for lack of subject matter jurisdiction if the court "lacks the statutory or constitutional authority to adjudicate the case." *Heidarnejad v. United States Citizenship & Immigr. Servs.*, No. 1:23-CV-1083, 2024 WL 1107432, at *2 (W.D. Tex. Mar. 5, 2024) (citing *Home Builders Ass'n of Miss., Inc., v. City of Madison*, 143 F. 3d 1006, 1010 (5th Cir. 1998)). Importantly, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C.A. § 1331; *see J.V. v. Brownsville Indep. Sch. Dist.*, No. 1:21-CV-115, 2022 WL 2134416, at *11 (S.D. Tex. Feb. 1, 2022) ("Federal courts have subject matter jurisdiction over claims brought under federal law.").

For a plaintiff to satisfy the requirements of pleading subject matter jurisdiction, courts may consider: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts." *Id.* Because jurisdictional dismissal is "generally prohibited," a court may only dismiss a claim for lack of subject matter jurisdiction if a claim appears to be "immaterial and made solely for the purpose of obtaining jurisdiction," or is "wholly insubstantial and frivolous." *Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. 1981) (citing *Bell v. Hood*, 327 U.S. 678 (1945). This in turn requires that the plaintiff "has no plausible foundation" or "is clearly foreclosed by a prior Supreme Court decision." *Id.* "Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action. . . [f]or it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Id.*

**B.  Legal Standards for Pleadings Under Federal Rule of Civil Procedure 12(b)(6)**

As an initial matter, Federal Rule of Civil Procedure 12(b)(6) motions for dismissal of a claim must take into account the minimal notice pleading standard of Federal Rule 8, which "do not require an inordinate amount of detail or precision." *Gilbert v. Outback Steakhouse of Florida Inc.*, 295 Fed. App'x. 710, 713 (5th Cir. 2008) (citations and quotations omitted). Those pleading standards require

only "a short and plain" statement of the plaintiff's claim and not "an exposition of [her] legal argument." *Skinner v. Switzer*, 562 U. S. 521, 530 (2011). Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 127 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As such, dismissal is "a harsh remedy" and "is viewed with disfavor and [] rarely granted." *Beanal v. Freeport–McMoran, Inc.,* 197 F.3d 161, 164 (5th Cir.1999); *Great Plains Trust v. Morgan Stanley,* 313 F.3d 305, 329 (5th Cir. 2002) ("district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies…unless it is clear that the defects are incurable.").

In assessing a Rule 12(b)(6) motion, courts must treat all well-pled allegations in the complaint as true, and any reasonable inferences arising from them must be construed in the light most favorable to the plaintiff. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993). A federal court may not apply a standard "more stringent than the usual pleading requirements of Rule 8(a)" in "civil rights cases alleging municipal liability." *Id.* To survive a motion to dismiss, a complaint need not pin plaintiff's claim for relief to a precise legal theory and only contain sufficient factual matter, which if accepted as true, "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.*, 550 U.S. at 570). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556. The plausibility standard does not require an employment discrimination plaintiff to plead a prima facie case of discrimination in the complaint." *Swierkiewicz v. Sorema*, 534 U.S. 506, 511, (2002); *see also Raj v. Louisiana State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013) (same).

### III.  LEGAL ARGUMENT

Defendants make a variety of arguments in favor of dismissal, each of which the Court should reject. Tellingly, Defendants appear to toggle between different legal standards without clearly

specifying which standard Plaintiff fails to meet for each claim. Most of their arguments appear to be based on Rule 12(b)(6) for failure to state a claim based on insufficiently pled facts. Defendants' wholesale disregard of Plaintiff's plentiful, detailed factual allegations auger against doing so. Furthermore, Plaintiff's claims arise out of federal statute and constitutional grounds, making them quintessentially suitable for adjudication by the federal courts and making dismissal for lack of subject matter jurisdiction improper.

Defendants also argue that Plaintiff's official capacity claims are duplicative and that her claims against individual Defendants are barred by qualified and/or legislative immunity. Qualified immunity shields government officials from liability for civil damages provided their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known. But the conduct complained of by Plaintiff as unconstitutional and discriminatory is clearly established. Likewise, legislative immunity offers protection to lawmakers acting in their legislative capacity. But individual Defendants were not acting within the scope of their legislative duties according to the Amended Complaint, and at any rate such argument is premature. Hence Defendants' other arguments must all similarly fail.

### A. THIS COURT ENJOYS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS

It is not initially clear why Defendants believe this Court does not enjoy subject matter jurisdiction over Ms. Baker's claims.[1] Ms. Baker brings claims under 42 U.S.C. § 1981 (through 42

---

[1] Confusingly, Defendants attach four exhibits to their Motion to Dismiss and reference them in their factual allegations. *See Mot. to Dismiss Amend. Compl.* at 23-32. Because Defendants contend that they do not seek to convert their motion to a motion for summary judgement, these exhibits should be ignored. Should the Court consider them however, they do not support Defendants' assertions that Plaintiff's claims should be dismissed effectively converting their motion to a summary judgment motion, and Plaintiff should be allowed to respond to further. The exhibits and their content have neither been cited by Plaintiff as Defendants falsely describe, are heavily disputed including what they show and given testimony provided by Defendants under oath in earlier proceedings, and do not fall within the limited parameters for consideration under Fed. R. Civ. P. 12(b) cited by Defendants in their Motion, which is ostensibly to "assist[] the plaintiff in establishing the basis of the suit, and the court in making an elementary determination of whether a claim has been stated." *Id.* at 5.

U.S.C. § 1983), 42 U.S.C. § 1983 to enforce her federal Equal Protection Clause and First Amendment Rights, and 42 U.S.C. § 1985 claims. *Amended Compl.*, at 31-42.  She also intends to amend and bring Title VII claims under the federal Civil Rights Act of 1964. *Id.* at 42-43. All such claims are subject to the subject matter of the district courts pursuant to 28 U.S.C.A. § 1331 which is clearly stated in Plaintiff's Amended Complaint. *Id.* at 2. Given any specific further arguments as to why the federal district court is deprived of jurisdiction, Defendants' vague references to lack of subject matter jurisdiction should be rejected.

### B. Plaintiff Pleads Official Capacity Claims Appropriately

Defendants Cunningham and Milum seek dismissal of the claims brought against them in their official capacities, arguing that such claims are duplicative since they are equivalent to suing Llano County. *Mot. to Dismiss Amend. Compl.*, at 10. Plaintiff disagrees, as has this Court implicitly in the past. Official capacity claims are manifestly appropriate under the circumstances here, which undisputedly involve the official acts of a government official.

While official capacity suits are "another way of pleading an action against an entity of which an officer is an agent" they can be brought alongside claims against the governmental entity. *Monell v. Dep't of Social Servs*., 436 U.S. 658, 690 n. 55 (1978); *see also Turner v. Houma Mun. Fire & Police Civil Serv. Bd*., 229 F.3d 478, 485 (5th Cir. 2000) (holding that if "the Board can be sued then Board members in their official capacities are also proper defendants.").

Defendants argue that because official capacity claims are equivalent to claims brought against the entity, they are therefore unnecessary and must be dismissed. However, this argument incorrectly assumes that redundancy necessitates dismissal, a leap that is unsupported by legal precedent. Official capacity claims serve to identify individuals responsible for policy and decision-making, which is essential in cases involving allegations of unconstitutional policies or practices. Under § 1983, plaintiffs are required to identify individuals whose actions represent official policy

responsible for the alleged violations. *Moss v. Kopp*, 559 F.3d 1155, 1168-69 (10th Cir. 2009) ("a municipality can be liable under § 1983 if the 'final policymaker' takes the unconstitutional action.").

If Defendant Cunningham or Milum are found to be final policymakers and acted unconstitutionally with respect to their duties, an official capacity claim would ensure that any injunctive or declaratory relief is properly enforced.[2] *See Kentucky v. Graham,* 473 U.S. 159, 167 n. 14 (1985) (holding that a state official is a "person" under § 1983 because official capacity actions for prospective relief are not treated as actions against the state.) Official capacity claims allow a court to issue orders that are explicitly directed at the individuals responsible for the discrimination and prevent further violations of federal law. As representatives of the governmental entity, Defendants Cunningham and Milum hold unique positions with specific responsibilities that are central to Plaintiff's claims. Therefore, official capacity claims brought against Defendants Cunningham and Milum are not redundant but necessary to capture the full scope of the alleged violations in Plaintiff's complaint. Given the lack of clarity over which individual(s) had final policymaking authority over library personnel and the disputes over § 1983 organizational liability, official capacity claims against both Cunningham and Milum should remain pending full discovery.[3]

### C. DEFENDANTS DO NOT ENJOY LEGISLATIVE IMMUNITY

Defendants argue that individual capacity claims against the County Judge and four members of the advisory board should be dismissed because they are all local legislators that "enjoy absolute immunity for their legislative acts." *Mot. to Dismiss Amend. Compl.,* at 11. First and foremost,

---

[2] The same Defendants did not seek a dismissal of official capacity claims brought against them in *Little et. al. v. Llano* because they concede that official capacity claims are appropriate for injunctive or prospective relief.  No. 23-50224 (5th Cir. 2024).

[3] This Court in *Little et. al. v. Llano* did not identify one individual as the final policymaker and instead cited to *Doe AW v. Burleson Cnty.*, which designated county commissioners court as the final policymaking authority over all areas entrusted to them by the state constitution and statutes. No. 1:20-CV-00126, 2022 WL 875912, at *4 (W.D. Tex. Mar. 24, 2022).

legislative immunity is an affirmative defense, and thus generally should not form the basis for dismissing a plaintiff's claims under Rule 12(b). *See Plaquemines Par. Ventures, LLC v. Plaquemines Par. Council*, No. CV 23-7337, 2024 WL 1463186, at *2 (E.D. La. Apr. 4, 2024) (rejecting claim that legislative immunity deprives the court of subject matter jurisdiction under Rule 12(b)(1)). Indeed, because "[l]egislative immunity is an affirmative defense under Texas law," the burden typically falls upon the defendant to establish its applicability, making it an ill-fashioned vehicle for Rule 12(b) motions. *Id.*; *see Dillenberg v. Watts*, No. 420CV00458, 2021 WL 2906069, at *6 n.14 (E.D. Tex. June 18, 2021) (granting dismissal on other grounds but declining to dismiss on the basis of legislative immunity); *Meecorp Cap. Markets, LLC v. Tex-Wave Indus., LP*, No. C.A. C-06-148, 2006 WL 2883054, at *2 (S.D. Tex. Oct. 5, 2006) ("Where a defendant moves to dismiss a case based on an affirmative defense, a successful 'defense [must] appear[ ] clearly on the face of the pleadings' in order to justify dismissal.").

Second, Defendants rely on an overbroad interpretation of legislative immunity in support of their argument. While legislators have immunity for their legislative acts in principle, "not all actions taken by an official with legislative duties are protected by absolute immunity." *Minton v. St. Bernard Parish School Board*, 803 F.2d 129, 135 (5th Cir. 1986). Such immunity "applies [only] to activities, not offices." *Bryan v. City of Madison, Miss.* 213 F.3d 267, 272 (5th Cir.2000). The Fifth Circuit distinguishes between legitimate legislative functions, which are protected, and administrative functions, which are not. *Hughes v. Tarrant County,* 948 F.2d 918, 920 (5th Cir. 1991) (not all acts are protected by immunity – only those that "are functionally legislative.").

Courts have also made a distinction between establishing a policy, act, or law and enforcing or administering it. The Fifth Circuit has held that actions specific to individuals or particular situations, rather than the establishment of broad policies, does not qualify for legislative immunity. *Hughes*, 948 F.2d at 921. In *Hughes*, the plaintiff brought a claim against the defendant county

commissioners for refusal to pay his attorney fees incurred in contempt proceedings. *Id*. Defendants attempted to raise legislative immunity as a defense, but the Circuit Court found that while the case concerned allocation of county monies – a power enumerated to the county commissioners – the decision to withhold attorney fees was not based on legislative acts but rather on specific facts of the plaintiff's employment relationship. *Id*. at 921.

Decisions about discipline and termination are typically classified as administrative actions rather than legislative ones, particularly where the employment action involves selective layoffs or individual terminations. *See In re Montgomery County*, 215 F.3d 367, 376 (3d Cir. 2000) (finding the decision to eliminate a particular employee rather than employee's position constitutes an administrative, rather than legislative act); *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (holding that select layoffs of particular employees do not constitute legislative acts); *Smith v. Lomax*, 45 F.3d 402 (11th Cir. 1995) (finding the County Board of Commissioners' decision to replace its white female clerk with an African-American female clerk was not a legislative act, but instead an administrative one and, therefore, not protected by immunity).

Defendants rely on *Bogan v. Scott-Harris* and *Tenney v. Brandhove* to support their argument that Defendants named in their individual capacities are entitled to legislative immunity regardless of the challenged action. 523 U.S. 44 (1998), 341 U.S. 367 (1951). But the significance of *Bogan* and *Tenney*, however, is simply that legislative immunity applies to local legislators for their "legislative activities." *Bogan*, 523 U.S. at 49; *Tenney*, 341 U.S. at 376. Defendants ignore the plethora of courts that have squarely distinguished between administrative and legislative duties, and which limited application of *Bogan* and *Tenney* to legislators only when they are acting "in the sphere of legitimate legislative activity." 341 U.S. at 376. For example, in *Kamplain v. Curry County Board of Commissioners,* the Tenth Circuit rejected the defendant county commissioners' argument that they were entitled to legislative immunity after they removed the plaintiff from a public hearing for

expressing dissatisfaction at the board's decision to award a bid to a competitor. 159 F.3d 1248, 1252 (10th Cir. 1998). The court held that the legislators' decisions to ban the plaintiff from all future meetings and, subsequently, allow him to attend meetings but prohibit him from speaking was outside the scope of legislative immunity, as it was administrative in nature. *Id.*; *see also Wright v. Montgomery County*, 215 F.3d 367 (3rd Cir. 2000) (distinguishing *Bogan* and denying legislative immunity for acts directed at specific parties); *Hansen v. Bennett*, 948 F.2d 397, 403 (7th Cir. 1991) (denying immunity to legislator who removed disruptive person from council meeting because legislator "was not voting, speaking on legislation, or investigating a legislative issue at that moment.").

Plaintiff's claims in this case are not based on the legislative acts of Defendants. Instead, as in the cases listed above, they are based on administrative decisions by the individual Defendants to discriminate and terminate the employment of a specific librarian. Therefore, none of the Defendants are shielded by legislative immunity from liability to Plaintiff and Defendants have failed to satisfy their burden of proving otherwise.

A. **DEFENDANTS VIOLATED 42 U.S.C. § 1981**[4]

1. **Plaintiff Pled Sufficient Facts to State a Claim for Relief Against the County**

The County asserts that Plaintiff cannot maintain a cause of action for a violation of § 1981 under § 1983[5] because she failed to identify a policy or custom that was the moving force behind the

---

[4] The Fifth Circuit considers claims of intentional discrimination, which include racial discrimination and retaliation claims based on Title VII and 42 U.S.C. § 1981, under the same rubric of analysis. *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002).

[5] As a preliminary matter, Defendants' strategy of seeking dismissal of official capacity claims against Defendants Cunningham and Milum on grounds that those claims are duplicative of the claims against Llano County while simultaneously seeking dismissal of the claims against the County improperly limits Plaintiff's ability to pursue any claims at all. If the court rejects those claims of blanket immunity for individual Defendants, then those same individual Defendants make no argument that warrants dismissal of Plaintiff's § 1981 claims against them in their *Motion*, as only the County moved on the basis for failure to state a claim.

violation of her constitutional or statutory rights. *Mot. to Dismiss Amend. Compl.,* at 13.

With respect to § 1983, although a plaintiff must show: "1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged," (*Cox v. City of Dallas,* 430 F.3d 734, 748 (5th Cir.2005) (quoting *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001), the municipal policy or custom need not be reduced to writing. A plaintiff can point to:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F. 3d 784, 788 (10th Cir. 2010) (internal quotations omitted); *see also Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984)p.

Moreover, a municipality can be liable under § 1983 if the "final policymaker" takes an unconstitutional action. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 (1968). When a governmental entity's final policy and decision-maker in a single action directly and intentionally deprives a person of a federal constitutional right, the person so deprived need not show that a policy or custom caused his injury in order to recover. In such a case, the entity's action is deemed to be the direct cause or moving force behind the deprivation of right and injury. *Coggin v. Longview Indep. Sch. Dist.*, 289 F.3d 326, 333 (5th Cir. Tex. 2002) (school district liable for discharge without hearing by school board), *affirmed en banc*, 337 F.3d 459 (2003); *see also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161 (5th Cir. 2010) (a custom consists of actions that occur for so long and with such regularity "that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct"). A plaintiff may either show that the final policymaker committed or

commanded the violation of plaintiff's federal rights or that the final policymaker indirectly caused the misconduct of a subordinate municipal employee. *Board of the County Commissioners v. Brown*, 520 U.S. 397, 405-07 (1997). Thus, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404; *see also Sorlucco v. New York City Police Department*, 971 F.2d 864, 871 (2d Cir.1992) (municipality may be held liable where the unconstitutional conduct of subordinate employees is "so manifest as to imply the constructive acquiescence of senior policy-making officials.").

Given the nascent stages of litigation, a plaintiff need not identify a single or specific policymaker in the complaint at the pleading stage. *Groden v. City of Dallas, Tex.*, 826 F.3d 280 (5th Cir. 2016). Instead, it is sufficient for the plaintiff to plead facts demonstrating that the defendant acted pursuant to an "official policy which was promulgated or ratified by the legally authorized policymaker." *Id.* at 285. When the policymaker element is raised in a Rule 12(b)(6) motion, the court must determine only if the pled facts, viewed in the light most favorable to the plaintiff, include the policymaker element, without requiring the plaintiff to pinpoint the specific identity of said policymaker. *Id.*

In the case at hand, Plaintiff has properly pled that "policies" of a policymaker violated her constitutional rights. Ms. Baker also pled sufficient facts, particularly in tandem with Texas law, to support the theory that Defendants Cunningham and Milum are final policymakers within the structure of Llano County. *See Amended Compl.*, at ¶¶ 7-9. Ms. Baker alleges facts that Cunningham and Milum planned and orchestrated her termination in furtherance of their efforts to censor and discriminate against people of color and the LGBTQ+ community and their allies. *Id.* at ¶ 119-124. Plaintiff's Amended Complaint also sets forth the County's practices, policies, and customs that interfered with Plaintiff's rights under 42 U.S.C. § 1981 and her right to be free from discrimination

and retaliation. *Id.* at ¶ 58, 66, 71, 73, 75, 77, 80-88, 94-96, 105-106.

The systematic nature of the individual Defendants' racist censorship efforts, including but not limited to those of Defendants Cunningham and Milum, demonstrates that these practices were so widespread as to have the force of law, meeting the standard for establishing municipal liability. The County then took deliberate steps to restrict Ms. Baker's participation in public meetings and ultimately terminated her employment for opposing these policies. Accordingly, Ms. Baker has sufficiently identified policies and customs that were the moving force behind the violation of her constitutional rights, thereby substantiating her §1983 claim for a violation of §1981.

### 2. Plaintiff Pleads Sufficient Facts of a Racial Discrimination Claim

The County argues that Plaintiff fails to establish any of the elements of a racial discrimination claim in employment under Section § 1981 and Section § 1983.[6] Specifically, the County contends that Plaintiff did not demonstrate that she is a member of a protected group, was qualified for the position at issue, was discharged or suffered some adverse employment action by the employer, nor replaced by someone outside her protected group or treated less favorably than other similarly situation employees. *Mot. to Dismiss Amend. Compl.,* at 13-14.

As a preliminary matter, the County has entirely neglected to address Plaintiff's associational and advocacy claims, which are central to her § 1981 claim. By focusing solely on the traditional elements of racial discrimination, the County seems to rest upon the faulty assumption that a plaintiff must personally satisfy all of the elements of § 1981 to proceed with a claim. Consequently, the County fails to acknowledge that § 1981 protects against discrimination based on association with and advocacy for members of protected groups and in doing so effectively concedes that Plaintiff has

---

[6] The County also refers to Title VII, which overlaps in some legal frameworks, although is not yet at issue here and bares some notable differences, particularly in that Title VII does not require discriminatory animus to be a "but for" factor and only a "motivating factor" in an employment decision tainted by animus.

pled the elements of these claims. Plaintiff has also articulated sufficient facts to support her retaliation and anticipatory retaliation claims.

### i. Law and Facts Supporting Association and Advocacy Discrimination

Courts have "imputed" the protected characteristics of the victim class to their advocate for purposes of discrimination claims. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) (holding that high-level white admissions officer at university had standing to bring a discrimination claim based on his advocacy for affirmative action or women and racial minorities); *see also Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (speech-language pathologist's advocacy on behalf of her disabled students sufficient to support a retaliation claim under Section 504 of the Rehabilitation Act). This is because the law "protects individuals who, though not members of a protected class, are "victims of discriminatory animus toward [protected] third persons with whom the individuals associate." *Barrett v. Whirlpool Corp*., 556 F.3d 502, 512 (6th Cir. 2009). An employee may sustain a claim of unlawful associational discrimination if **s**he can show that: (1) **s**he was discriminated against at work (2) because **s**he associated with members of a protected class. *Id.* at 513. "Individuals are also protected from discrimination because of their advocacy on behalf of protected class members." *Barrett*, 556 F.3d at 513 (describing nature of advocacy claims under Title VII). "As with the question of association, the key questions are whether [employees] were discriminated against, and whether the reason for the discrimination was their advocacy for protected employees." *Id.* at 514.

The individual Defendants' discriminatory animus has already been detected by the Court in earlier proceedings underlying the events forming the basis of Ms. Baker's allegations. *See Little v. Llano County*, 2023 WL 2731089 at 1, 9 (finding that Defendants targeted and removed books, including well-regarded, prize-winning books because "they were books about critical race theory and related racial themes."). In her Amended Complaint, Plaintiff provides evidence of statements

and conduct by the individual Defendants and the County that manifested a desire to discriminate not only in book selection, but against patrons and constituents who shared the characteristics of being racial minorities. *Amended Compl.*, at ¶¶ 45, 55-56, 64, 160-162. For one such example, Defendant Wells stated that she opposed books "about CRT" because they "pitted races against each other" and because she did not think it was "appropriate to have books where one child thinks he's better than another because of his skin tone." *Id.,* at ¶ 160. Similarly racist animus inspired the Bonnie Wallace Spreadsheet discussed in Ms. Baker's Amended Complaint. In advocating for these books, authors, patrons and employees of the library, Ms. Baker alleges that Defendants came to associate her with those constituencies, retaliate against her advocacy on their behalf, and ultimately terminate her. As the Supreme Court explained in *Price Waterhouse v. Hopkins*, when a plaintiff can directly link biased comments or actions to an employer's decision-making, she has produced direct evidence of discrimination. 490 U.S. 228, 251 (1989) (sex-stereotyping direct evidence of decision-makers' discriminatory basis for employment decision). As a result, Plaintiff has alleged sufficient evidence that Defendants engaged in discrimination against her due to her association and advocacy that race was a "but for" cause of her termination.

### ii.    Plaintiff Asserts Sufficient Facts of Retaliation Under § 1981

Defendants[7] argue that Plaintiff's pleading does not support the claim that opposition to discrimination was a "but for" cause of her termination. *Mot. to Dismiss Amend. Compl.,* at 14. Like discrimination, a plaintiff may prove retaliation in one of two ways: either by presenting direct evidence of discrimination, or through circumstantial evidence by satisfying the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "[D]irect evidence of retaliation is evidence, which if credited, does not require any inference or presumption

---

[7] It is unclear from the motion as to which Defendants seek dismissal of Plaintiff's anticipatory retaliation claim. Plaintiff will assume that the dismissal is requested by all Defendants.

to establish that unlawful retaliation motivated an employer's action." *Gorny v. Salazar*, 413 Fed. Appx. 103, 107 (10th Cir. 2011); *see Trans World Airlines, Inc. v. Thurston*, 496 U.S. 111, 121 (1984) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").

Alternatively, under the *McDonnell Douglas* burden-shifting framework a plaintiff must demonstrate that (1) she engaged in protected opposition; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id*. While *McDonnell Douglas* involved a Title VII race-discrimination claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to § 1981. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975); *see also Johnson v. Halstead,* 916 F.3d 410, 420 (5th Cir. 2019) (holding "[r]etaliation claims under § 1981 and Title VII ... "require[ ] proof of the same elements in order to establish liability.").

Unlike discrimination claims, however, which require the adverse action be an "ultimate employment decision," retaliation claims are governed by a less stringent standard. *Johnson v. Halstead,* 916 F.3d at 419. To sustain a claim for retaliation, plaintiffs need only be subject to an employment decision that was "materially adverse," which means that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). As evidence of retaliatory animus, courts typically hold that mere temporal proximity between the protected activity and the adverse employment action establishes the causation element at the motion to dismiss stage. *See Long v. Eastfield Coll.,* 88 F.3d 300, 305 n. 4 (5th Cir. 1996); *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007) (concluding that two and one half months is enough to support an inference of a causal link). And although the Fifth Circuit has yet to weigh in, district courts presume that retaliatory hostile work environment satisfies the adverse action prong. Hence, a

plaintiff can demonstrate actionable retaliation if: 1) the plaintiff engaged in protected activity under an anti-discrimination law; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Perez v. City of Floresville*, No. SA-23-CV-00990, 2023 WL 8285227, at *4 (W.D. Tex. Nov. 30, 2023).

For purposes of § 1981, Ms. Baker engaged in protected activity by opposing discrimination against patrons and employees of color and the censorship of books with racial themes. Following her objections, she faced a series of adverse actions, including public reprimands, false accusations, adverse characterization, and ultimately termination, all of which were conducted in a highly public manner. According to Plaintiff's allegations, a number of these directly disclose a retaliatory motive, for example her reprimand for "insubordination" and "creating a disturbance" for attending meetings and complaining about discrimination, even as a private citizen. Defendants further terminated Ms. Baker for "violation of policies" and "failure to follow instructions" to remove books. Such evidence constitutes direct evidence of retaliation.

Defendants' actions went beyond termination. With words and deeds, they created a hostile work environment intended to dissuade Ms. Baker and other employees from opposing discriminatory practices, and the close temporal proximity between her protected activities and these adverse actions establishes a strong causal connection. Given the substantial evidence of retaliatory actions, even under the *McDonnell Douglas* framework, Ms. Baker has established a compelling claim for retaliation under § 1981.

### iii.    Plaintiff Asserts a Viable Claim for Anticipatory Retaliation

Defendants argue that a claim for anticipatory retaliation has not been recognized by the Fifth Circuit and even in the districts it has been recognized, it is limited to situations where an employee

is forced by their employer to choose between exercising a protected right or being fired or suffering an adverse action. *Mot. to Dismiss Amend. Compl.*, at 14. Contrary to Defendants' narrow interpretation, several circuits, including district courts in the Fifth Circuit, have broadly interpreted Title VII's (and thus § 1981's) antiretaliation clause applying it to "preemptive employer actions [that] preclude employers from discriminating against employee actions and precludes employers from discriminating against employees it fears will later engage in protected activity." *Holt v. Houston Methodist Sugar Land Hosp.*, Case No. 4:19-cv-564, 2020 WL 989911, at *7 (S.D. Tex. Feb. 10, 2020) (quotations omitted); *see Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993) (same); *E.E.O.C. v. Bank of Okla.*, No. 03-CV-0657-CVE-PJC, 2005 WL 7870754, at *5 (N.D. Okla. Jan. 18, 2005) (same). In such cases, "[a]lthough a protected activity is generally required to state a valid [ ] retaliation claim, courts have found that in certain instances, an [employee] need not undertake protected activity to successfully establish a retaliation claim." *E.E.O.C. v. Cognis Corp.*, No. 10- CV-2182, 2012 WL 1893725, at *2 (C.D. Ill. May 23, 2012). An employer may not discriminate against an employee who it fears will later participate in protected conduct. *E.E.O.C. v. Bojangles Rests., Inc.*, 284 F. Supp. 2d 320, 328 (M.D.N.C. 2003). In *Holt*, the Southern District of Texas explicitly recognized that a "preemptive strike" against an employee in anticipation of that employee's protected activity may serve as the basis for a claim of retaliation in violation of Title VII. 2020 WL 989911, at *7.

Defendants' anticipatory retaliation against Ms. Baker is illustrated in the Amended Complaint through the articulation of a series of coordinated and targeted actions aimed at silencing Ms. Baker when she opposed or refused to participate in discriminatory and unconstitutional removal of library materials, and the individual Defendants' consistent irritation, frustration, and overt hostility towards Ms. Baker as a result of her actions. After each effort to oppose what she sincerely believed to be discriminatory censorship and conduct, Defendants engaged in increasingly abrasive

and punitive measures including limiting participating, defaming Ms. Baker, and ultimately terminating her. *Id*. at ¶¶ 98 – 111, 119. Thus, not only is the claim of anticipatory retaliation valid, but Plaintiff has alleged sufficient facts to support her claim.

### 3.   § 1983 Provides Individual Liability for Officials Who Have Violated § 1981

Defendants argue they are immune from liability for violations of § 1981 as well as Equal Protection Clause Violations based on sexual orientation and gender identity (sex), and First Amendment Retaliation. This is untrue. Defendants Cunningham and Moss argue that they cannot be sued under § 1981 in their individual capacities because they are elected officials. *Mot. to Dismiss Amend. Compl.,* at 15. In support of their argument, Defendants cite the *Oden v. Oktibbeha County* decision, which states § 1981 liability does not "impose[] personal liability on elected officials for discrimination in the terms and conditions of local government employment contracts. 246 F.3d 458, 464 (5th Cir. 2001). However, personal capacity claims can be sustained under § 1983, without distinguishing between elected and unelected status of the official. The Supreme Court has held "on the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In *Hafer v. Melo*, the court affirmed plaintiffs' personal capacity claims brought against the newly elected auditor general, stating "to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." 502 U.S. 21, 25 (1991). The court rejected defendants' argument that she cannot be held liable in her personal capacity for action taken in her official capacity, calling the argument "unpersuasive… and foreclosed by [ ] prior decision." Similarly in  *Med Corp. v. City of Lima*, the court affirmed that the mayor could be sued in his individual capacity because acting in his official capacity as mayor does not immunize him from being sued as an individual under §1983." 296 F.3d 404, 416 (6th Cir. 2002). Defendants' argument that personal capacity claims cannot be brought against elected officials

wrongly assumes absolute immunity to state officials from personal liability for acts within their authority, contradicting established precedent and case law. Therefore, the court should reject Defendants Cunningham and Moss's argument to dismiss personal capacity claims brought against them.

### B. PLAINTIFF HAS SUFFICIENTLY PLED § 1983 EQUAL PROTECTION CLAUSE VIOLATIONS

For the same reasons that Plaintiff prevails on her § 1981 claim, she prevails on her § 1983 claim alleging discrimination, retaliation, and anticipatory retaliation based on sex, sexual orientation, and/or gender identity. To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an "intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998). Defendants argue that Plaintiff has neither identified a protected class nor articulated that her sex/gender or her opposition to discrimination was the "but for" cause of her termination. *Mot. to Dismiss Amend. Compl.*, at 16. As argued above, Defendants completely ignore Plaintiff's associational and advocacy arguments and rest upon the faulty assumption that a plaintiff must personally exhibit the protected characteristics herself.

Sexual orientation, gender identity discrimination, and sex discrimination have all been widely recognized as protected classes for which equal protection of laws applies. The Supreme Court in *Bostock v. Clayton County, Georgia* held that sexual orientation and gender identity are characteristics protected against discrimination under prohibitions on sex discrimination. In no uncertain terms, "to discriminate against employees for being homosexual or transgender, [a person] must intentionally discriminate against individual men and women in part because of sex." 140 S. Ct. 1731, 1743 (2020). In other words, "[a]n employer who fires an individual merely for being gay or transgender defies the law." *Id.*; *see also Glenn v. Brumby*, 663 F. 3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination [under 42 U.S.C. 1983], whether it is described as being on the basis of sex or gender.

Indeed, several circuits have so held."); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 578 (6th Cir. 2004) (plaintiff successfully stated a claim for relief under Title VII and 42 U.S.C. § 1983 in alleging sex discrimination based on her transgender status).

Plaintiff has alleged sufficient facts to show that Defendants' censorship efforts were driven by their discriminatory animus towards LGBTQ+ community members. *Amended Compl*., at ¶¶ 44, 55-56, 94, 140, 146, 161, 164. As Plaintiff alleged in her Amended Complaint, Defendants in their individual and official capacities expressed routine animus against the LGBTQ+ community, including animus against community members, literature by LGBTQ+ authors, and LGBTQ+ content. Therefore, Plaintiff has not only pled a protected class, but shown that she is entitled to benefit from it based on her association with and advocacy for such individuals.[8]

Defendants argue that retaliation claims growing out of complaints of employment discrimination have not been recognized under the Equal Protection Clause of the Fourteenth Amendment and district courts within the Fifth Circuit have similarly rejected such claims. *Mot. to Dismiss Amend. Compl.*, at 17. Contrary to Defendants' assertions, no Circuit, let alone the Fifth Circuit, nor has the U.S. Supreme Court, held that a retaliation claim cannot be brought under the Equal Protection Clause. In fact, the Second Circuit has explicitly held that retaliation claims under §1983 are permissible and that retaliation for discrimination complaints constitutes a "deprivation of any rights, privileges, or immunities" under the Equal Protection Clause of the Fourteenth Amendment. *See Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 81 (2d Cir. 2015). The *Vega* court reasoned that retaliation is a form of discrimination and if a public employee links a retaliatory

---

[8] Defendants again raise the argument that Plaintiff's Fourth, Fifth, and Sixth claim should be dismissed because she has failed to plead facts that establish that the challenged conduct at issue was taken or promulgated by a policymaker – caused by a custom or policy of the government entity or the single unconstitutional act by an official who has final policy-making authority. In response, Plaintiff references the argument made above in III(C)(1).

action to discrimination, the allegation constitutes part of their equal protection discrimination claim.

*Id.* The Supreme Court has also recognized such claims under similar anti-discrimination laws. *See*

*Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167 (2005) (retaliation for complaints of unlawful

discrimination is a form of discrimination). According to the *Vega* court:

> Retaliation against a person because that person has complained of sex discrimination is
> another form of intentional sex discrimination encompassed by Title IX's private cause of
> action. Retaliation is, by definition, an intentional act. It is a form of "discrimination" because
> the complainant is being subjected to differential treatment. Moreover, retaliation is
> discrimination "on the basis of sex" because it is an intentional response to the nature of the
> complaint: an allegation of sex discrimination. We conclude that when a funding recipient
> retaliates against a person *because* he complains of sex discrimination, this constitutes
> intentional "discrimination" "on the basis of sex," in violation of Title IX.

*Id. (*quoting *Jackson,* 544 U.S. at 173–74). Similarly, Defendants' retaliation against Plaintiff for

opposing their discriminatory practices is actionable under the Equal Protection Clause.

Defendants rely on five district court cases within the Fifth Circuit to argue that retaliation

claims are not recognized under the Equal Protection Clase of the Fourteenth Amendment. *Mot. to*

*Dismiss Amend. Compl.*, at 17. However, two of these cases were decided before *Vega*. The three

post-*Vega* cases rely on precedents that predate *Vega*. Interestingly, the district court cases cited by

Defendants often rely on decisions from other circuits, such as the Tenth, Sixth, and Eleventh Circuits,

all of which also pre-date *Vega*. Therefore, considering that the Fifth Circuit has historically relied on

decisions from other circuits, the *Vega* holding is the most recent and relevant authority, supporting

the continuation of Plaintiff's equal protection retaliation claim against the individual Defendants.

The elements of a retaliation claim based on an equal protection violation under § 1983 mirror

those of § 1981 and Title VII. The plaintiff must plead that: (1) defendants acted under the color of

state law, (2) that defendants took adverse employment action against her, (3) because she complained

of or otherwise opposed discrimination. *Vega,* 801 F.3d at 91. Defendants argue that Plaintiff failed

to identify an affirmative action taken by any individual Defendants to constitute a causal link in the

termination of her employment. *Mot. to Dismiss Amend. Compl.*, at 17. But for the same reasons as Plaintiff claims there is evidence of retaliation under §1981 she alleges sufficient evidence under §1983.

## C.  PLAINTIFF HAS SUFFICIENTLY PLED A FIRST AMENDMENT RETALIATION CLAIM

The First Amendment to the U.S. Constitution mandates that a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). An employee's "First Amendment rights are protected unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1304 (10th Cir. 2009). Courts determine whether a public employer has violated an employee's First Amendment rights by looking at four elements: (1) plaintiff suffered an adverse employment decision; (2) plaintiff's speech involved a matter of public concern; (3) plaintiff's interest in commenting on a matter of public concern outweighed the government employer's interest in promoting efficiency; and (4) the protected speech motivated the defendant's conduct. *See Kinney v. Weaver*, 367 F.3d 337/336 (5th Cir. 2004). Defendants' challenge the third element and argue that Plaintiff's speech is not protected under *Garcetti* because it was "in relation to her duties and authority as a County librarian." *Mot. to Dismiss Amend. Compl.*, at 19.

While speech by public employees made pursuant to their official duties may not always comprise protected speech under *Garcetti*, public employees retain the right to speak as private citizens on issues of public concern. 547 U.S. 410, 417 (2006). Public employee speech on matters of public concern is also protected under the First Amendment when, as here, it is made outside the scope of the employee's ordinary job duties. *Anderson v. Valdez*, 845 F.3d 580, 596 (5th Cir. 2016) (held that a law clerk's reports of alleged financial improprieties by a justice to both the Chief Justice of the Texas Supreme Court and the State Commission on Judicial Conduct sufficiently demonstrated that the clerk's speech addressed a matter of public concern and was outside the scope of his ordinary

job duties). Simply because a citizen's speech involves information obtained through their job or aspects of their job does not make it employee speech instead of citizen speech. The consideration depends on whether the speech itself is typically within the scope of the employee's duties, not whether it merely relates to those duties. *Lane v. Franks*, 573 U.S. 228, 230 (2014).

First, it is uncontested that the issue of potentially unlawful censorship in public libraries is quintessentially a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 148 (1983) (noting that speech warrants protection when it "seek[s] to bring to light actual or potential wrongdoing or breach of public trust"); *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir.2004) (finding that "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern"); *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926 (9th Cir. 2004) (holding that "when government employees speak about ... wrongdoing [or] misconduct ... by other government employees, ... their speech is inherently a matter of public concern." Substantively, complaints of discrimination, as a matter of law, are a matter of public concern as well. The Supreme Court has held that even internal complaints whose content pertain to discrimination caused by a policy or practice of a public entity is speech on a matter of public concern. *Givhan v. Western Line Consol. School Dist*. 439 U.S. 410 (1979) (held that a public-school teacher's communication to her principal about racially discriminatory employment practices and policies in the school in which they both worked was protected speech).

Second, a public employee's act is not within his scope of employment when it occurs within an independent course of conduct not intended by the public employee to serve any purpose of the government employer. *Anderson*, 845 F.3d at 596. When public employees speak in direct contravention to their supervisor's orders, that speech is often considered private speech. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013).

Much of Ms. Baker's speech against the Defendants' censorship activities was made in her

capacity as a private citizen. Defendants ignore multiple allegations where Plaintiff clearly indicates that she was speaking as a private citizen and not in her capacity as a librarian. *See Amended Complaint* ¶¶ 98, 102. For instance, at the January 31, 2022, meeting, when Defendant Wallace asked Ms. Baker why she was present, Ms. Baker responded that she was "concerned about the censorship efforts of the New Board and the impact it would have on her ability to access books as a member of the community served by the Llano County Library System." *Id*. at ¶ 104. Similarly, Ms. Baker voluntarily elected to attend some of the library board meetings on her own time as a private citizen. *Id*. at ¶ 102. Her attendance and speech at these meetings were not within the scope of her employment duties as she was not required to attend and participate in these meetings as part of her job. Indeed, the Library Board, the Commissioners, and Defendant Milum did not want any employees at the meetings in their official capacities, and to that end indeed ordered Ms. Baker and other librarians not to attend. *Id*. at ¶¶ 109-111.

Furthermore, it is outside the scope of Ms. Baker's duties as a librarian to oppose censorship within the library district. Ms. Baker returning books back on the shelf after these books were removed by Defendant Milum constitutes protected speech as do her complaints to Defendant Milum about the censorship efforts of the County Commissioners and New Library Board. *Id*. at ¶¶ 59-64. Ms. Baker's conduct and speech opposed a custom, policy or practice of discrimination that not only impacted her as a constituent served by the library system, but also others who relied on the services of Llano County Library System. Defendants offer no compelling basis for concluding otherwise. Ms. Baker's speech is protected by the First Amendment under clearly established law and she has pled sufficient facts to support that claim at this stage of litigation.

### D.  INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants with individual capacity claims against them argue that they are entitled to a defense of qualified immunity because Plaintiff fails to identify official action by each Individual

Defendant that was taken with respect to Plaintiff's employment that violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Mot. to Dismiss Amend. Compl.*, at 15. Although it is far from clear, Defendants presumably argue as much with respect to all of Ms. Baker's § 1983 claims, including those for § 1981, Equal Protection Clause based on sex/sexual orientation/gender identity discrimination, and First Amendment claims.

Qualified immunity shields government officials from liability for civil damages as long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine balances two interests, that of: "holding public officials accountable when they exercise power irresponsibly and shielding officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A right is considered clearly established when the contours of that right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The individual Defendants' assertion that Plaintiff fails to identify specific actions violating clearly established rights is a misapplication of the qualified immunity standard. To successfully claim qualified immunity, defendants must demonstrate that their conduct did not violate clearly established statutory or constitutional rights and that they did not know, nor could a reasonable person in their position have known, that their actions were unlawful. But the limitations upon censorship, particularly in the context of public libraries and schools, is well-documented and widely known. In *Board of Education v. Island Trees Union Free School District No. 26 v. Pico*, for example – way back in 1982 – the Supreme Court held that that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." 457 U.S. 853, 872 (1982); *see also Counts v. Cedarville School District*, 295 F.3d 1022

(9th Cir. 2003) (holding that a school board's decision to restrict access to the Harry Potter books violated students' First Amendment rights). The principles in *Pico* have even greater force when applied to public libraries and subsequent cases have consistently struck down attempts at book banning and censorship. The case of *Sund v. City of Wichita Falls, Texas*, is similar to the case at hand. 121 F. Supp. 2d 530 (N.D. Tex. 2000). In *Sund*, Defendants attempted to relocate certain children's book to the adult section of the library. *Id*. The court held that a public library could not restrict access to children's books in this manner, finding such restrictions unconstitutional. *Id*. Such cases establish a clear precedent that book bans and censorship based on content, particularly when motivated by racial or ideological animus, violate clearly established constitutional rights. These precedents were well-established long before Defendants undertook their censorship efforts, providing clear notice to reasonable officials that engaging in such efforts is unlawful. Significantly, if the pleadings show an objectively unreasonable violation of a clearly established constitutional right, the affirmative defense of qualified immunity is unsustainable at the motion to dismiss stage.

Here, Plaintiff has provided specific allegations of actions taken by individual Defendants that violated her constitutional rights, including instructing her to remove "CRT and LGBTQ+ books" from the library. Amended Compl., at ¶¶ 37, 53, 58. Ms. Baker warned Defendant Milum that the censorship efforts were in violation of First Amendment protections. *Id.*, at ¶¶ 61-62. Tellingly, Plaintiff alleges that Defendants Moss, Wallace, Schneider, Gaskin and Cunningham closed meetings to the public because patrons present were taking notes in order to avoid public scrutiny. *Id.* at ¶¶ 93. Recently, the Fifth Circuit itself observed in a decision now on appeal en banc, that "the books were clearly removed at the behest of county officials who disagreed with the books' messages" and that "book[s] may not be removed for the sole- or substantial – reason that the decisionmaker does not wish patrons to be able to access the book's viewpoint or message." *Little et. al. v. Llano County*, No. 23-50224 (5th Cir. 2024). That fact that viewpoint suppression based on personal preference and

discriminatory animosity is prohibited to public officials is clearly established, and a reasonable official would understand that doing so and then terminating Ms. Baker's employment in retaliation violates the constitution.

### E.  THE INTRACORPORATE CONSPIRACY DOCTRINE IS INAPPLICABLE TO § 1985

Defendants argue that Plaintiff's § 1985(3) claim is barred under the intracorporate conspiracy doctrine in the context. *Mot. to Dismiss Amend. Compl.*, at 20. The intracorporate conspiracy doctrine generally holds that the employees or agents of a single entity cannot form a conspiracy under § 1985 because they are considered part of the same entity. *See Ziglar v. Abassi,* 582 U.S. 120, 153 (2017) This doctrine is intended to prevent the same entity from being subject to conspiracy liability simply because its agents are acting within the scope of their employment. *Id.* However, the doctrine is not absolute and there are significant exceptions that apply.

First, the intracorporate conspiracy doctrine only applies if the alleged conspirators are acting "in their official capacities." *Id.* While the Fifth Circuit has not spoken directly on the subject, an exception exists where the alleged conspirators act for their own personal purposes. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. 1981) (stating that where "the officers of a corporation act for their own personal purposes, they become independent actors, who can conspire with the corporation"); *Benningfield v. City of Houston*, 157 F.3d 369 (5th Cir. 1998) ("A possible exception to the intracorporate conspiracy doctrine exists where corporate employees act for their own personal purposes.").

Second, the intracorporate conspiracy doctrine does not shield individuals who act outside the scope of their employment, their actions exceed the bounds of their authority, or they have engaged in unauthorized acts. *See Buschi v. Kirven*, 775 F.2d 1240, 1252-53 (4th Cir. 1985) (the doctrine does not apply when the employees exceed the bounds of their authority or they engage in unauthorized acts in furtherance of the conspiracy); *Cross v. General Motors Corp.*, 721 F.2d 1152, 1156 (8th Cir.

1983) (recognizing an actionable conspiracy where the alleged conspirators acted outside the scope of their employment).

Third, § 1985(3) on its face stops "two or more persons" from conspiring "for the purpose of depriving, either directly or indirectly, and person or class of persons of the equal protection of the laws, or of the equal privileges and immunities under the laws; or for the purpose of preventing of hindering the constituted authorities of ant State or Territory from giving or securing to all persons…the equal protection of the laws." Hence on the statute's face, the intracorporate conspiracy doctrine does not apply, as no exception is made for individuals acting within the same organization or entity. Indeed, such a reading would render § 1985 meaningless. The law was passed to stop such colluding organizations such as the Ku Klux Klan and its members from depriving racial minorities of their constitutional rights. Congress, in response to state-legislated "Black Codes," adopted the Enforcement Acts of 1870 and 1871 (Enforcement Act, Ch. 114, 16 Stat. 140 (1870)), to provide a federal civil cause of action for civil rights violations committed by state actors, and authorized criminal penalties and civil remedies for conspiracies by private individuals to deprive a person of federally protected civil rights. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 205 (1970) ("Stirred to action by the wholesale breakdown of protection of civil rights in the South, Congress carried to completion the creation of a comprehensive scheme of remedies - civil, criminal, and military - for the protection of constitutional rights from all major inference."). In this case, Plaintiff has alleged that the individual Defendants were motivated by personal biases and discriminatory animus towards racial minorities and LGBTQ+ individual and acted to deprive them of equal protections and privilege of law. According to Plaintiff's Amended Complaint, the individual Defendants were driven by personal interests and prohibited ones at that. In harassing, reprimanding, and terminating Ms. Baker, they sought to stifle class rights and to hinder her and other public employees from giving or securing to all persons the equal protection of the laws, all of which is forbidden under § 1985.

Respectfully Submitted: July 9, 2024

> */s/ Azra Taslimi*
> Azra Taslimi*
> Iris Halpern*
> RATHOD | MOHAMEDBHAI LLC
> 2701 Lawrence Street
> Denver, CO 80205
> Telephone: (303) 578-4400
> ih@rmlawyers.com
> at@rmlawyers.com
> *Attorneys for Plaintiff*
>
> *\* Admitted Pro Hac Vice*
>
> JEFF EDWARDS
> State Bar No. 24014406
> EDWARDS LAW
> 603 W. 17th St.
> Austin, Texas 78701
> Tel. 512-623-7727
> Fax. 512-623-7729
> jeff@edwards-law.com